17-2332 Dorothea Barclay v. Club Foods, LLC Your Honor, my name is Michael Collins. I'm an attorney. I represent Dorothea Barclay v. Apple Office My name is Jeffrey Cohn, and I represent the defendant, Club Foods All right. And keeping in mind that we are familiar with your briefs and the record, how much time would you like, Mr. Cummins? I think probably 15 minutes or less. Okay. And Mr. Cohn? I would agree with that. All right. And I will tell you that the microphone in front of you is not for amplification. It's solely for recording purposes. So if you could keep your voices up, we would appreciate it. And with that, Mr. Cummins, would you like to proceed?  All right. Don't worry. We'll let you know when you're done. Don't worry about it. All right. And Mr. Cummins, please have a seat. Thank you. May it please the Court, I represent Dorothea Barclay, and we've appealed the trial court's ruling granting the defendant's summary judgment on Ms. Barclay's negligence claim that she had filed against the defendant's doing business as super fresh market. We seek a reversal and a remand. Fresh market filed an answer to the complaint. They also filed an affirmative defense of comparative negligence, and we filed a response to that. When my client filed her complaint of negligence, she also filed a jury demand. The court, in ruling on summary judgment, appeared to find that a certain post inside the store owned by the defendants was an open and obvious object and that my client's contact with it as a result is non-actionable. Do you agree it was open and obvious? I think I would probably have, if I said no, I think I'd have to say it from under the podium instead of standing up in front of you. It was right out there on the aisle on the way out of the store. Yes, it was open and obvious. As an open and obvious post, obviously my client and I are relying on the distraction exemption that I believe was first talked about in Ward v. Kmart. We believe there's a factual issue as to whether my client was distracted or not. Well, Ward involves somebody carrying a big mirror outside of a big box store. And so the court found that the store owner could anticipate, because it sells such items, that someone might be carrying something like that and wouldn't see what is otherwise open and obvious obstruction. And here, Ms. Barkley's holding a lottery ticket. Yes, a scratch-off lottery ticket. Not exactly the same thing. She is holding a ticket that the defendant wanted her to buy. The defendant made money from lottery ticket sales in the store. Right, you've made that point, but the defendant didn't have anything to do with the fact that she was walking and looking at her lottery ticket, trying to decide whether she should put it in her pocket or purse or whatever. Correct. And as she was doing that in the short walk from the lottery machine to the only exit that the customers could use, her foot came in contact with the bottom of the post, three foot high, cast iron, painted black. The post was there to protect the security device, an expensive security device that was there. It was to prevent people or grocery carts from bumping into the security device. There was a gap at the bottom of the post between the post and the floor, and her foot became jammed into that gap, and that caused her to fall and be injured. Did you, before the trial court, was there anything in the record before the trial court regarding this gap? Yes. The defendant says that there was no evidence presented to the trial court with regard to the gap, that it was brought up on appeal. Is that incorrect? No, there was testimony in her deposition that her foot and her deposition transcript was before the trial court in our response to the motion for summary judgment. I didn't represent Mrs. Barkley in the trial court. Another attorney did. So I believe it was brought up only because all the documents in the record on appeal showed to me that the trial court had her deposition in which she said there was a gap and my foot got entangled, I think she used the word entangled, in the gap and down she went. The post had been there for eight years. That was the period of time that the defendants owned and operated the Super Fresh Mart. There was testimony that the floor had been repainted. There was testimony that the floor was mopped every day. They seemed to take very good care of the store. The post had been repainted at one point. As I said earlier, the post idea was to take the shock of carts or people rather than bump into the post than have them bump into the security device. So this post was there for quite some time. I believe the president of the defendant company said he was there on an average of about four days a week. And he was in the area of this post. They maintained it by painting it. They maintained it. They controlled it. It was totally under their control. And this gap was allowed to form. Now, we had a bit of a dispute in DiApoli's brief. He referred to my statements that you could loosen it or tighten it with a wrench as a manufactured fact. We can give you the record on appeal cases, pages rather, where the president testifies all you needed was a wrench to loosen or tighten that post. I think what Mr. Cohen was saying was that the scenario where the plaintiff's foot became wedged in this gap was something that was manufactured. All she said in her deposition was, I became entangled in the post and I fell down. She didn't say anything about a gap. And so that's how I read his brief. All right. Well, I think she had said that she was caught in a gap at the base of the post, but obviously the briefs and the records will speak for themselves. I think that is what she said. I've written down a quote of it. But the point is the fact that there was a gap there was totally within the control of the defendants. After the accident, obviously, they could have brought people in to examine the post. It was their post, photograph it, do everything they want, and if they could, turn to the trial court and say there was no gap. Okay, but Ms. Collins, in your brief, very early in your brief, you say her bag got twisted, got caught by the post. Then at another part you say she was looking down at the lottery ticket to see if she got what she wanted to get. Then at another part you say, oh, she was looking down at the lottery ticket to decide whether to put it in her purse or her pocket. And then all of a sudden there's a gap. And so, frankly, I was having a little trouble figuring out what the story was. Like, what is it that she said happened? And I agree with my colleagues, I don't think that the gap is mentioned in the deposition. I don't think the trial court considered any argument that there was a gap. I think the trial court considered what she said in her deposition when she was looking down at the lottery ticket. Mm-hmm. Mm-hmm. I can only give you what I understand the facts to be as they've been given to me. And based upon the exact words that she used in her deposition, she said as far as her discretion was concerned, she said I'm trying to decide to put the scratch-off lottery ticket in my pocket or just glance to see if what I got is what I got. Apparently there are a whole variety of scratch-off tickets, and that's what she was looking at. And her testimony in her deposition was that her foot became entangled in a gap at the bottom of the post. I'm incredibly reluctant to disagree with Your Honor. Obviously, Your Honor is going to make the ruling on the case. But I do believe that she did say there was a gap. If you want, I can get her deposition now and read the words that she said under oath in her deposition. But whether or not there's a gap, your argument is, as I understand it, that she was distracted by the lottery machine, correct? Right. The fact is, though, she already had left because she had turned away from the lottery machine. It wasn't the lottery machine that distracted her. Oh, God, no. Okay. No, Your Honor, the lottery machine. There was some statement in the response to the motion for some re-judgment in the trial court where, in very awkward wording, it does sound like counsel for Ms. Barkley is saying she was distracted by the lottery machine. Giving him all I can give him, I believe what he was trying to say is that the blighted lottery machine in her path on the way out the store was a distraction. I'd say it was an attraction. It attracted her. She wanted it. She felt, I think she testified. But still, she was turned away from it. I mean, she was looking at her. One way or the other, it appears from her testimony, she was looking at the ticket. Exactly. She was talking about that ticket. So if anything distracted her, it was whatever she was doing with that ticket. The ticket, not the machine. Not the machine. She was past the machine, on her way out. So how is the food store then responsible for somebody who's looking at their ticket? Because it could be foreseen by the defendant who wanted people to buy lottery tickets, that after getting the scratch-off ticket or lottery ticket out of the machine, that they might very well look at it as they moved toward the exit. I would argue that that's something that's foreseeable by the defendant. They placed the machine there. They could have placed the machine anywhere else in the store. But, frankly, they wanted the customers, as I would, to buy lottery tickets after they had paid for their groceries. Or they wanted customers not to have to go into the store, to just come in to buy lottery tickets and leave right away. Exactly. Exactly. But the lottery ticket, the lottery machine was where they wanted it to be, and it got her right on the way, her path out of the store. And she got it. I think it's foreseeable that somebody's going to want to take a look at this ticket. I can't show you a scratch-off ticket, but I did bring one with me. I had my daughter buy one yesterday. Well, I hope it's a winner. But don't look at it now. I won't. We don't want you to. There's a lot of printing. But the question is that we also agree that this is open and obvious. So if it's open and obvious and she's looking at the ticket, how do you mesh those two together? Our argument is that the gap wasn't open and obvious at the bottom. Either it's found that the testimony was that there was a gap, or that there's no testimony that there was a gap. I contend that the testimony in the record shows that the plaintiff testified that there was a gap.  It wouldn't matter if the post was painted neon pink. It's the gap that's the problem. Because if she's looking at a lottery ticket, it doesn't matter what color the post is. She's going to be distracted no matter what. And it's that gap that is the key to your argument. They made the argument in the trial court that, well, the defendant should have padded the post, should have painted the post a bright yellow or something. I put that in my brief. But, frankly, it wouldn't have made a difference in the world whether, as you say, it was painted neon or there was padding around it or anything else. If there was no gap, it would be her toe touching the post, and you would realize your toe has hit something. You'd look at it, walk around it, and we wouldn't be here today. Wait. Mr. Cummins, let me just ask you a question. In the pictures that were included as exhibits, there are apparently three machines lined up against the exterior wall, but on the inside of the store by the doors going out. And there's a security thing. So there are doors, a security thing, which, from the picture, is almost as large as the doors to the outside of the store. And there's a post right inside of this, right in front of the security thing. And then there's a cash machine, and then there's a lottery machine. Right. So there's, I don't know, two feet, two and a half feet, whatever the cash machine dimensions are between the lottery machine and this security device. In addition, the pictures clearly show there's no room to wiggle between the security device and the post. The security device is tall. It's taller than the average person. Right. It's right there. You can't miss it. It's right there. And the post is right next to it. So since you can't go between them, if you're paying attention, you have to go around the post to get out because you can't go – there's no shortcut between the security device and the post. You can't do that. So if she were looking, she would have seen, first of all, she's got two feet to stop and look at her lottery ticket and then take two steps and figure out what she's going to do because she's not right on top of that post at the lottery machine. There's a good two feet before she gets to it. But more important, if she had looked up at all, even if she had seen the post, which I believe is a clear and obvious – and you've admitted it's clear and obvious – she would have seen the security device and you can't get past that. It sticks out a little bit past the cash machine. So she can't get through it. She can't get past it. She can't wiggle between them. I just – I don't see how she could not have noticed this, how she could not have paid attention to it. She was distracted. Distracted by a lottery ticket that she purchased. She willingly purchased it. That the store owner wanted her to drop the ball. Well, in addition – It's different from, say, for instance, Bruns v. Centralia, which is cited by the appellee, where the clinic did absolutely nothing. The person saw the door of the clinic, saw the stairs of the clinic, and then tripped and fell on a defect in the sidewalk. Well, how do you hold the clinic responsible for that? If she was distracted, it was all of her own doing. In this case, we have the added element of the fact that the store wanted her to buy the ticket. Well, wait a minute. The store didn't necessarily want her to stop and scratch it or look at it or decide whether to put it in her purse or her pocket. It was her decision. She decided to do that while she was carrying bags of groceries and walking out of the store. The store didn't say, hey, stop right here, pay attention to the lottery ticket, but keep walking. She decided to buy the ticket. Just like she decided you could go in a grocery store and decide to buy oranges and then say, oh, wait, did I get six or did I get eight, and get distracted by whether or not you bought the right number of oranges. What's the difference? It's a grocery store. They sell stuff. Well, you know, Mr. Ward in Ward v. Kmart had been to that Kmart store in the past. You could say, well, he knew where the poles were outside. He was carrying a big mirror. Why wasn't he more careful? Why did he know the pole was there if he had been to the store before? Why wasn't he paying attention? Because the pole has a top as well as a bottom, and the mirror did not go all the way to the top of the pole. Exactly my point. They have pled comparative negligence. The picture shows. I would say that there may well be a comparative negligence element in this case. Mr. Cummins, the picture makes it very obvious. The security device is, I don't know, four feet, five feet, six feet tall, whatever it is. It sticks out past the edge of the cash machine. You can clearly see it. It's not hidden. It's there, and the space between the post and the security device is not big enough for a normal person with grocery bags and a purse to slither through. So if you can't get through that space, you have to go around it. And she had to see the security device if she was paying attention. Well, again, I think it comes down to if she's paying attention, and if Mr. Ward in Ward versus Kmart was paying attention, I think he would have seen some part of the post that he was about to walk into while holding a mirror. He was distracted, and the Illinois Supreme Court recognizes it as an exception to the open and obvious rule. We believe that our client was distracted, and we believe that that distraction was caused by her purchase of an item the store wanted her to buy, and she was doing a fairly foreseeable thing of checking out to see what she got out of the machine. And then her foot touched the, as you point out, Your Honor, it's a very short distance between the lottery machine and the post. It didn't take long. It's a few steps, and her foot then hit the bottom of it, and then the question is, was there a gap or wasn't there a gap? And I guess the record will either bear out whether there was or there wasn't, but we contend that there was a gap and that she testified that there was a gap and her foot got caught. No gap. Her foot touches the post. She realizes she's touched the post, and she moves around it. That, in sum, is the case, I guess. I think Your Honor has narrowed matters down very, very well. Anything further? We'll give you a short rebuttal after Mr. Cohen, if you have anything else you'd like to say. Okay, Your Honor. Thank you very much. Thank you. Thank you. Thank you. And I'll pick up my phone. All right. Thank you. All right, Mr. Cohen. May it please the Court. You know, this case has been difficult for me because I was involved in the trial, involved in the deposition, involved in the motion for summary judgment. I wrote it. I was the one who was involved in the reconsideration. And I always say, especially to my kids, is we can argue about whether Monday is a good day or a bad day, but the one thing we've got to agree on is Monday is Monday. The facts in this case are that there is no gap between the bottom of that pole anywhere.  And she didn't trip in a gap. She didn't test it. Is there anything in the record from anyone regarding a gap? No one. The first time I even hear that is when we get to here. Up until now, we've heard a variety of stories of which Your Honor pretty much laid out. First it was the machine was the distraction, except that she had her back to the machine at the time that she fell. Then it was that the pole has something wrong with it, but we don't know what's wrong with it. They never, you know, they never point out that this pole has any kind of dangerous condition or it's not kept up or there's a problem with it. So in the first instance, when counsel is saying, well, you know, they should tighten up the pole, yeah, my client did testify at his deposition because he was asked, can you loosen the pole? Yes, we can loosen the pole with a wrench. Can you tighten the pole? Yes, we can tighten the pole with a wrench. However, there was no need to untighten or tighten this pole because there was no problem. If You Honor said they had the opportunity to look at the transcript, we've cited exactly where she says it. She only says that she got her foot entangled in the pole as she was walking, and at the time she got it entangled, she's looking at her lottery ticket. So let's just take that scenario. Yes, do they put a machine in their store because they want to make money from selling lottery tickets? Yeah, for the same reason that they put oranges in their store and boxes of cereal. And she goes to the machine and she buys it. Oh, that was the other one. The original one was as she was rising, and you'll find that in the briefs, as she was rising from the machine, she turned and got her foot trapped in the entangle, in the pole. However, we know that couldn't stand up because the pole's over there, the machine's over here, she's turned and she's walking. Now, what she's doing is she's looking at a lottery ticket, trying to decide what she should do with it and see if she got what she got. There's no dispute as to any of these facts that I've just laid out. Counsel can tell you that he believes that there's some gap, but yet in the brief he wrote, in the brief they wrote prior, you will not find anywhere where they cite to anywhere in the record where there's this gap. What this pole is, and I hope you could tell from the pictures, what this pole is, is if you were to imagine right here, this was a security device. There's a half pole. It goes like this, and it sits in front of the security device. It serves two purposes. One is so that people do not knock their carts or walk into this thin security device because the cost of replacing that would be a constant as people would be hitting it with their carts. The other reason is they don't want anybody to walk into it and get hurt. Now, this pole sits this way, but you have to walk, so to speak, to the wall and go around, as Your Honor pointed out, to come out. It is not blocking egress or ingress to this store. It is not sitting in the middle of the aisle. In the Ward cases, it's so distinguishable that I find it amazing that that's what they rely on. First of all, the court said in Ward that the post in that case could not be seen from the interior of the store. Okay? You can see our pole if you look, and she also testified. The plaintiff testified that she'd been to our store over 100 times, and she was aware of the pole. She knew there was a pole there, and yet still chose to look at a lottery ticket while she walked. The standard that applies in this case is the reasonable person standard, and the reasonable person standard says not what the plaintiff thinks is reasonable, but would a reasonable person have acted this way? And the answer is no. In the Ward case, the gentleman is carrying a large mirror. How else is he going to get out of the store with his large mirror? And that can be anticipated by the store owner that people will be carrying large, bulky items that will block their view. And he walks out, and the pole is located immediately outside the store within the area of egress and ingress, and the mirror obscured his view. I don't know how anyone could argue that a lottery ticket of about so big would obscure your view from seeing a pole that's sitting over there on the side. And that's the other really important thing that the court should consider. She didn't walk into a pole that was sitting out in the middle where people have to walk around the pole. She wasn't watching where she was going, and she drifted to the left. She had to drift because the pole doesn't sit out where anybody walks. It's got a machine right behind it, and she got her foot entangled in that opening in the pole, but as Your Honor pointed out, she shouldn't have been walking in that direction anyway, because you can't slide. There's nowhere to slide through to get out. No one's supposed to. You're supposed to go around to exit.  Sotomayor, that's all. Sotomayor, plaintiff also assigns error to allowing Mr. Akiva's affidavit and striking Mr. Robeson's affidavit. Did you address those issues in your brief? I did not address them. I don't want to invite you to address them now if you didn't address them in your brief. Well, I think I may have made mention, but for me, the affidavits of Mr. Robeson and Mr. Akiva do not turn this case. This case turns on the first issue. Is there any material fact upon which a trier fact could decide? But you're aware that the rules state that if an appellee does not respond to an issue, that it's forfeitable. Are you aware of that? I am aware of that. Your Honor, if I didn't address it. Well, you have one sentence at the very end which has no case law or anything and really doesn't address it. It says, the affidavits at issue in this matter bear no relevancy on the fact that plaintiff was not watching where she was walking and the distraction was of her own creation. But that doesn't address the rulings on the affidavits that were brought up in the appellant's brief. Your Honor, I would stand on my brief. I would point out that if this Court was to find that the brief of Mr. Robeson – I'm sorry, the affidavit of Mr. Akiva should not have been allowed in, it would not change the outcome in this case. The outcome in this case turns on whether or not the plaintiff has an exception to the open and obvious rule. And she does not. The defendant in this case did not create the plaintiff's distraction. The plaintiff created her distraction. If the courts were to find that a person could just simply – let's take a Barnes & Noble. The owner of a Barnes & Noble certainly anticipates that people will read the books that they buy. And they put the books out there so people will buy them. And they even have them sometimes near the door where you actually walk out. Would it be a reasonable person would read the book while walking out of the store? Would that – is that something that – Yes, good point. That would lead us to another case. But the Barnes & Noble certainly should not have to anticipate that somebody will walk into their door because they're reading a book that they bought at a Barnes & Noble. Because that's too large of a burden to place on – But here we have the affidavit of an expert who says that the design and the placement and so forth were such that it would be distracting. And what is he talking about? He's talking about where the machine is to the pole, okay? The distraction had nothing to do with the machine. And it really had nothing to do with the pole or the distance. What it had to do with was that the plaintiff was not watching where she was walking. She's looking at her lottery ticket. And now she wants the defendant to be responsible for her conduct as if the defendant could have done anything different that would not have caused her to walk into that pole. If you shut your eyes and you walk, you are going to walk into something. If you're looking at your cell phone and you walk and you don't watch where you're walking, you're going to walk into something. She could have walked into the pole. She could have walked into another patron and possibly injured another patron. If she's coming around the corner of a shelving and she's not watching where she's walking, it's possible she could trip on the bottom of the shelving. But what can a store owner do to prevent that? One of their arguments is, well, we should have painted the pole. And as Your Honor pointed out, and I think I pointed that out in my brief, what difference does it make what color the pole is if you're not looking at it? If you're not watching where you're walking, how does it change anything? All of the case law that is cited supports our position. All the case law, the Scott case, I understand the Ward case rather versus Kmart. Of course, they sold him something that they knew could possibly prevent him from watching where he was going when he went outside, and you shouldn't have a pole out there. There's the other case, which is Simmons versus American Drugstore. Whether a condition is obvious is determined by objective knowledge of a reasonable person, not the plaintiff's subjective knowledge. The plaintiff in that case was watching where he was walking, but he didn't lift his bags high enough to get over two cart nappers, I think I said that right, two cart nappers, that he didn't lift his bags up so he got them entangled and he tripped and he fell. That was foreseeable, because there's no other way to get out except to go between those two cart nappers, and it's foreseeable that people will walk carrying their bags and may not realize that by not lifting them high enough they're going to get entangled. We don't have anything like that in here. In our case, our plaintiff is distinguishable from all these plaintiffs. None of these plaintiffs in the cases, they're all at least attempting to either watch where they're going or they're being distracted by something that they bought. None of them are walking looking at their phones. None of them are walking looking at a lottery ticket. And so unless Your Honors have some other questions of me, in conclusion, I would say that the case law supports us. The affidavits that we've discussed would not change the outcome of this case. And I thank you. Thank you, Mr. Cohn. Mr. Cummins. Yes, Your Honor. Just a couple of points. With reference to Mr. Robeson's plaintiff's expert's affidavit mentioned by Justice Hyman, the problem that we saw there was that the court, with a broad ax, eliminated his entire affidavit. We don't ask for the entire affidavit of the president of the defendant to be stricken, just some portions of it. And we believe that that is the spirit of Rule 191. You don't kill a whole affidavit because you find paragraph 1, 2, 3, 4, and 5 to be objectionable, if something can be done with the affidavit. In Mr. Robeson's affidavit, it consisted of 27 paragraphs, numbered paragraphs. Seven of those paragraphs he mentions outside sources. So let's, for sake of argument, let's agree with you that the judge should not have stricken the whole affidavit, but just those six or seven paragraphs. Let's do that for sake of argument. You take Mr. Cohn's argument, he says it doesn't matter. What's your response to that? Because he says whether you have that affidavit there or not, it's besides the point. It's not the issue. Because I believe, Your Honor, that what the trial court did then was to eliminate evidence from his looking at it. He just didn't consider the affidavit at all, and he should have considered the affidavit at all. In point of fact, the trial counsel on the motion for reconsideration offered an affidavit that attached pages of material that Mr. Robeson had made references to, and according to trial counsel, the word was in effect the entire document should have been attached as an exhibit to the affidavit instead of just the sections that Mr. Robeson relied on. Fine, if you say that the court was correct in not allowing the second version of the affidavit with the attachments in, it should have been more surgical in its approach to Mr. Robeson's affidavit, as it should have been more surgical to the affidavit of Mr. Eli Akiva, the president of the defendant, who made outright conclusionary statements. The one last thing I will ask the court, I'll ask the lead to the court, and again, this may not clear it up. I hope it does, but it may not. These are the words of Ms. Barkley. What I do remember and recall before the incident occurred is that when I proceeded to move forward, I realized my foot was entrapped in something. And she said I just basically did a normal turn as possible as I could, and when I made that turn, I realized my foot was entrapped. Entrapped in what? The only thing she could be entrapped in would be the bottom of the pole, and the only reason it would be entrapped is because there was a space, a gap at the bottom of the pole. Thank you very much. Thank you very much. We thank both counsel for their arguments here this morning, and we'll take the case under advisement.